I'm a recently graduated law student with the University of Arizona Pro Bono Appellate Project. Congratulations. Thank you, Your Honor. And we're representing the appellant in this case, Ms. Moore-White. With me at the council table is Dean Willie Jordan-Curtis. With the court's permission, I would like to reserve three minutes for rebuttal. All right. Please note that the time is counting down, so when there are three minutes left, that's all you have. I'm having difficulty hearing you. He has problems hearing you. Is this all right now? Maybe you want to pull the mic up. Thank you, Your Honors. Can you hear him? This case is about Fann's refusal to accept responsibility for discriminatory interference with Ms. Moore-White's employment opportunities by tolerating a hostile work environment at Fann's work site caused by Fann's employees. This circuit has repeatedly recognized that a discriminatory interference satisfies Title VII's sum connection requirement for an employment relationship. You know, when I look at our cases on this interfering employer, because normally the Title VII claim goes to the employee's employer, and then we have a pretty narrow exception where some other employer, in effect, requires the employee's employer to discriminate. So this case is a little bit different because the other employer, you know, Fann, was not requiring, I guess it's MATEC, is that the name of the company? That's correct. MATEC to discriminate the way our cases have indicated, like in the CBAS case and that. But, in fact, MATEC wasn't discriminating and gave the employee a promotion and all of that. So it wasn't clear to me why this case fit into our narrow exception. The reason this case fits into our narrow exception, which the Court has set out, are essentially a two-pronged test. First, the defendant must have some peculiar control over the employment relationship between the plaintiff and the direct employer, in this case MATEC. So, for example, in one of our cases, the peculiar control was the patient couldn't hire the nurse without the approval of the hospital. And then in the school's case, the teachers couldn't be hired by the school unless they passed the state's test. So how does this case fit into that paradigm? Well, there's ample control here because the indirect employer, FAN, first of all, they had a contractual relationship with MATEC. But FAN didn't require MATEC to do anything, right? So, in other words, FAN didn't require MATEC to discriminate either intentionally or indirectly the way the other cases are. No, it's FAN's discrimination here that's the issue. It's FAN's employees and FAN's work site. And so that's why they are the party that should be held responsible. Right, but the peculiar relationship between the two employers has to have the effect of causing the second employer, the actual employer, to discriminate. And I don't see how that happened here. It has to have the effect of promoting discrimination. So here what happened is Ms. Moore White, as — So that's an extension of our doctrine, right? No, Your Honor, I don't believe so. I believe that the doctrine just requires there to be some peculiar control over the employment relationship itself. And so here the control was Ms. Moore White, in order to carry out her employment responsibilities, had to do so at FAN's work site. She had to do so working with FAN's employees, her coworkers. So you're basically saying, so if UPS sends a UPS worker to drop off materials at an employer's site, some other site, and that UPS employee is subjected to harassing catcalls or whatever, then the UPS employee would have a cause of action under Title VII for every establishment that he drops packages off. Is that correct? Is that the effect of your analysis here? Okay. Essentially, I mean, on a — not exactly, because the difference between that situation and this situation is the pervasiveness of the control. In that situation, there would have been very little control of the indirect employer and the UPS package person. The package person is there maybe two, three, ten minutes tops. Whereas here, Ms. Moore White's entire employment was at FAN's work site. So any subcontractor on any job, but you have like a temporal duration. Is it a day, a whole day? Is it a whole week? Is it a month? Why does that make a difference for that analysis? Because the analysis is whether there was sufficient control. Sufficient control of the actual employer though, right? Of the employment relationship itself. Which employment relationship? Between the plaintiff, Ms. Moore White, and the direct employer, MATEC. And so, for example, here, if you look at — They told MATEC to fire her, to get rid of her, to take her off the job, and MATEC refused. How does that show peculiar control of that relationship? First of all, it shows that FAN thought it had the authority to exercise that level of control. But it didn't, right? But they did succeed. As a matter of fact. They did succeed in altering her terms of employment, because she was then thereafter required to sign in an hour early when other employees did not have the same requirement. Did she complain to MATEC about what she was experiencing on the job? I don't believe there's any evidence on the record of her complaining to MATEC. Or, no, excuse me, of her complaining to FAN. But in the complaint itself, she does mention that she contacted her supervisors at MATEC at least three times. And so what we have — but even if she had not contacted, that's not a requirement, because it would be a very perverse policy for the court to rule against individuals that are so harassed that they're not able to come forward and complain. Well, but in the general Title VII precedent, there is a requirement that the person who's being harassed make known that the harassment is unwelcome. So why should there be a different standard here? She did make known because she contacted her direct employer several times. Additionally, if you compare this case to the Gomez case, which I think is the most analogous, and Gomez versus Alexian Brothers Hospital on page 1021 of the court's opinion, the court noted that what's important here is whether the interference rises to the level where, quote, the conditions of plaintiff's employment are different than they would have been. And so that's a very low level of interference. I don't really understand Gomez. That was an odd case. So there he had the plaintiff had tried to get hired, his company hired by another hospital to do emergency room services, right? Right. And the hospital said, no, we don't want Hispanics here, and so rejected their claim. So it seemed that what the court was saying is that changed his relationship to his current employer because he couldn't get that job as a director of emergency services at the hospital. Do you understand it's saying something else? Your Honor, I believe what Gomez stands for is the proposition that when the terms and conditions of employment change, that constitutes sufficient corruption. That's such a general proposition. I mean, I don't know how that helps us here. Well, it's important to remember this in perspective. What we're talking about here is just whether or not there is a sufficient employment relationship to proceed to the actual merits of the case. We're not – this Court does not have the duty to adjudicate the full merits of the case. The trial court never had the opportunity to reach the full merits of the case. The discriminatory interference theory only goes to whether or not there was a sufficient employment relationship to proceed to the merits themselves. And so there is a lower standard because this is just a threshold issue. This is not – the fact that there is discriminatory interference and thus there is a sufficient employment relationship does not necessarily mean that there is sufficient evidence on the merits because the merits were never actually examined. And here – But could we affirm the district court on the alternative basis that even if you got to the merits, the conduct complained of did not rise to the level of creating a hostile work environment? You could do so, Your Honor. However, that would ignore the evidence that Ms. Moore-White has submitted to the hostile work environment. And, in fact, FAN itself admitted to at least one meeting where sexually charged comments were made. If we consider all the evidence that's in the record and we determine that after considering all the evidence that's in the record, there was not a material issue of fact regarding the existence of a hostile work environment, would you lose? Yes. Okay. Yes. So tell me what the evidence is in the record of a hostile work environment. Yes, Your Honor. Well, first of all, we have the meeting that FAN itself admitted to where sexually charged comments were made. Now, the fact that Ms. Moore-White was not actually present at the meeting and yet found out about the comments anyway goes to show the pervasive nature of the rumor mill, so to speak, at this worksite where such sexually charged comments were passed around the worksite. But is the existence of sexually charged comments in the workplace enough in and of itself to create a hostile work environment? Yes, Your Honor. In Harris v. Forklift Systems, the Supreme Court held that the standard for a hostile work environment is, quote, an environment that a reasonable person would find hostile or abusive, end quote. So more specifically, what exactly was there in the record? There was one comment that was made at a meeting she wasn't present. And was there another comment or was there another incident? Yes, there was another incident where there was a comment made. I hesitate to say the exact wording of the comment, but regarding the first comment was something about the female employees having an itch in their pants. Right. Right? Yes, Your Honor. Okay. As sexually charged comments go, that's fairly mild. Well, when you have And what was the other comment? And there was one other comment that was reported or one other incident? There was at least one other comment regarding in the supplemental on tab 13 of the Plaintiff Appellant's Excerpt of Record on page 17, paragraph number 2. She talks about, you know, the use of the F word and other incidents. Additionally, there was an incident. There was some bad language, but I don't see that as being sexually charged. Additionally, there was language regarding the composition of the soil and Composition of the soil? The composition of the soil being as hard as the male anatomy. And additionally, Ms. Morewhite testified in affidavits, which were backed up by other inspectors, that there was a number of incidents.  incidents. They didn't go into all the specifics. But you have to remember that at this point, we're just looking, is there a genuine issue of material fact? You're down to two minutes and 14 seconds. Yes, Your Honor. Do you want to save it for rebuttal?  Thank you, Your Honor. Thank you, counsel. Thank you. Good morning. Good morning. May it please the Court. My name is Emily Kreger. I'm with the law firm of Littler Mendelsohn. And we are representing Fan Contracting. Appellant spent the majority of her argument in brief asserting that Fan Contracting controlled Ms. Morewhite's work environment. And therefore, she has a viable interference claim under Title VII in the ADEA. Appellant's assertion is incorrect for several reasons. The first is that Fan did not control the work environment, and Fan did not control Ms. Morewhite's work on the site, as she alleges. But if she is working all day, so somebody could be sent to another company to work in a position for six months or a year. And although her direct employer is some contractor, in effect that person is working at the company. So why wouldn't, under the language of Title VII, why does that prevent her from having a suit against that indirect employer if they are, in fact, affecting the terms of her employment? Certainly. Well, I think Title VII contemplates an employment relationship, although the courts have been clear that that doesn't necessarily mean the traditional direct employer relationship. However, I think the scenario that you're contemplating is different from the scenario we have here. They were working on a large work site. Fan Contracting had contracted with MACTAC to have Ms. Morewhite come in as a quality control inspector. MACTAC controlled every aspect of her work on that job. The contract made it clear that it supervised her and did all the administering of her job duties. Ms. Morewhite's testimony made it clear that her day-to-day job responsibilities were dictated by her supervisor, David Burton, with MACTAC. But there's also evidence in the record that FAN employees dictated many of her daily tasks. Well, I think actually Ms. Morewhite's testimony was that her contact with FAN was, in her own words, sparse. The nature of their direction was essentially just to tell her where she needed to do the inspections that she was hired to do in terms of how she did the inspections, when she did the inspections, questions that she had about them. They were directed to either her supervisor, David Burton, or to FHA employees, in particular Sherry Branton and Albert Gonzalez, who were project engineers there. In her deposition, she said that the supervisors on the job would tell her where to report certain places they wanted inspected, and she would ask them, what do you want me to do today? And they would tell her what to do. That's pretty clear direction as to what she was supposed to do on a daily basis. Oh, I think the direction comes down to telling her where she needed to do the quality control inspections, and that was the extent of it. I believe her testimony is that they did not communicate very much with her about exactly what they wanted done, where they wanted done, and she was frustrated by that. But that's because the reality was she was reporting to David Burton at MACTAC and not FAN. Did that material issue affect then if they were giving her some direction and her direct employer was giving her some direction? Doesn't that raise a material question of fact as to whether or not the indirect employer had sufficient control to be responsible to her for employment discrimination? I don't believe so, because the, like I said, the only direction they're giving her is where to do the inspections. And under the case law in the Ninth Circuit utilizing the Mexican-American analysis of how you can find an indirect employer relationship, I don't think that alone is significant enough to show that they were controlling her work environment. Well, she doesn't have to show it. All she has to do is raise a material issue of fact. That's true, but I think that she still has to show that even if her allegation is accurate, that it rises to the level of control. And I think under the Mexican-American analysis, it does not rise to that level. In Mexican-American, they talked about the three sort of ways that you can find control in the work environment. The first is a highly visible nexus. And in the Sibley case, the court talked specifically about that issue. And in that case, they determined that there were two primary factors. The first is control of the premises, and the second was access to patients, which dictated their entire job duty and their job responsibilities. So that significant connection was there in Sibley, whereas in this case, it doesn't exist. But does Sibley have a – is that a floor or a ceiling? Does it have to rise to that level to raise a material issue of fact? Well, I think the nexus needs to be significant enough to show that there was actual control there. And I think in this case, that control has not been proven. And I think her testimony even contradicts itself when she states that the communication that she had with them was so sparse that in essence she was going to her supervisor at MACTAC to have her daily direction on the job. Why isn't that a jury question to determine whether or not there was sufficient control in light of the fact that the record shows at least some control? Because I think that the standards that the court have set out have left – that just working in the same work environment or having occasional contact with other individuals in that environment is not sufficient enough to show the level of control that's required in order to prove an interference claim like this. Your opposing counsel mentioned the fact that she was required to come an hour earlier than other employees. Now, wouldn't that be control? Well, I think the testimony on that issue was that FAN contracting was frustrated by the fact that she wasn't available to do the quality control measurements that they had contracted with MACTAC for her to do. So Mr. Torres communicated – I'm sorry, Ms. Torres communicated that frustration with David Burton at MACTAC. David Burton made the decision to require her to sign in every morning before coming to work so that it was clear that she was fulfilling that element of the contract. The fact that she came in early was not – A, her signing in was not dictated by FAN contracting. The fact that she came in an hour early was not dictated by FAN contracting. In a way it was, because it was because of the complaint from FAN that that condition was imposed. Well, I mean, I think that MACTAC ultimately made the decision, however, of how to resolve that issue and gave her the direction on how to resolve it. That's a classic example of interference. You go to another person's employer and say, we have a problem and we want you to solve the problem. But for FAN contracting going to her direct employer, this condition would have never been imposed. Well, but I also think that that condition is not significant enough to meet that – the standard of impacting the terms and conditions of her employment. I mean, being required to sign in in the mornings – Being required to come an hour earlier definitely impacts the workday. Yes, however, that wasn't – I agree that, you know, may have some impact on her job duties and when she does them. But again, that was a direction that was given by MACTAC on how to resolve that issue. It wasn't given directly by FAN. FAN only stated, look, she needs to be there to take the measurements when we need them. Let me ask you this. FAN asked for the plaintiff to be terminated, correct? Yes. If MACTAC had, in fact, terminated the employee based on the request of FAN, would that have been interference? I think, yes, it would have directly impacted the term and condition of her employment. It seems so. I mean, in our cases, it isn't just interference. I mean, that seems to go more to whether you're a joint employee or not. It seems that it has to be interference that causes the direct employer to discriminate. Right. And so what would be the direct interference or the interference in this record that caused MACTAC to give this employee a discriminatory workplace? Well, first, there was no tangible employment action that we can point to, unlike the other cases that have been before the Ninth Circuit. I think the argument that was made in the supplemental brief was that the hostile work environment is the interference that was impacting her work environment. And to that question, I think there is insufficient ‑‑ there's an insufficient record for her to prove that she was subjected to severe and pervasive harassment at the work site. You know, we talked about what's in the record and what's contained in the record to prove that. The first is the fan ‑‑ Mr. Torres at Fan Contracting admits that there was a meeting that took place where Ms. Moorwhite was not present, and Ms. Moorwhite admits she wasn't present, where a comment was made regarding female employees having an itch between their legs. Whether or not that was about Ms. Moorwhite or not is not clear, but regardless, the comment was made. Even ‑‑ and then the other ‑‑ the other incidences that they claim constitute a hostile work environment don't meet the severe and pervasive standard, or even the evidentiary standard. There are conclusory allegations contained in affidavits that she was subjected to harassing conduct. There was a phone call by a Tom Harris fan employee after the project ended, where he made a comment about there not being a sexual relationship, but at that point the project was ended and they were no longer working together. Ms. Moorwhite testified several times that the frustration that Fan Contracting had with her and with Melody Riggs, who was another quality control inspector that had been hired by the FHA on the project, that their frustration with them was that they wanted to do the job right. This has nothing to do with allegations of race, gender, or any other protected category. So what this comes ‑‑ and then the final issue is there was a problem with Ms. Moorwhite contacting Tom Harris on his telephone regularly. He complained to Fan Contracting about it, and Ms. Torres requested that Ms. Moorwhite not call him as much. So these are the two ‑‑ what it comes down to are basically those two incidents, a request that she stop contacting an employee and a conversation where a, you know, arguably sexual comment, although certainly there are much worse comments in the workplace that take place, but those two things alone are not sufficient to prove a hostile work environment. They're not severe and they're not pervasive. And the other issue is Title VII case law makes it abundantly clear that in order for an employer to be responsible or liable for a hostile work environment, they have to have notice of it. There is absolutely nothing in the record that shows that Fan Contracting has notice. So even if the court ‑‑ What was the response to opposing counsel's observation that it was sufficient that she notified her direct employer? Well, I don't know how you can equate that then with Fan Contracting having knowledge of the hostile work environment. If the court's decision were to be that Fan is the indirect employer, then Fan needs to have knowledge of it in order to be held responsible for the hostile work environment that it allegedly created. Just reporting it to MAC Tech is not sufficient. In fact, I think the reality that she only reported it to MAC Tech shows that she understood that that was her employer and to the extent a resolution needed to take place, MAC Tech was responsible for doing that. And so I think, you know, under those facts, even if the court were to determine that asking her to come in early to work or the other incidental things that Fan required her to do was sufficient to show this employment relationship, she can't meet the other two prongs of her task. There wasn't a hostile work environment and Fan Contracting had no notice. Under those circumstances, it would be inappropriate to find, to remand this or for the court to find that Fan Contracting was responsible for this alleged interference claim. Any questions? No. It appears not. Thank you, counsel. Thank you. I'd like to briefly address a comment brought up by Judge Ikuda regarding whether or not the defendant has to influence the direct employer to cause the harassment. And I think that's a misreading of the Court's previous cases. Looking, for example, at the Gomez case. In Gomez. Look at the other cases. Gomez is a little bit odd. But in the other cases, it's clear that the action of the direct employer, the defendant, is causing the indirect employer to discriminate. So the schools can't hire teachers unless they pass the test. Take, for example, the Sibley case. In Sibley, the discrimination prevented the direct employers, which would have been the patients who would have hired the private duty nurses, from ever having the opportunity to even interact with the plaintiff. And so there, it was completely the indirect employer that was responsible for the harassment. It's a similar situation in Gomez. And so there's at least two cases. Granted, Sibley is not from this circuit. But we have to bring the direct employer in there. You're not making a joint. I didn't read in your briefs a joint employer-type argument. So it seemed like you were trying to get it into the context of our interference cases. Certainly. And so there has to be some interference with the direct employer. So that's what I'm trying to understand here. Okay. Perhaps looking then at the most recent examination in the Anderson v. Pacific Maritime Association case. There, the defendant was not liable because it had no ability to remediate the discrimination because it did not control the workers. It did not control the workplace. It didn't control anything. So it was sort of a question as to why they were being sued in the first place, which is the question the court asked, actually. Right. Why did you dismiss your complaints against the actual employers? Exactly. Because if you look at that, the root of what was going on there was there was no opportunity to remediate the situation. Here, it's the polar opposite. It was FAN employees and a FAN worksite that were responsible for the harassment. Thank you, counsel. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court with thanks to
judges: Hug, Rawlinson, Ikuta